## In re TEXAS PRISON LITIGATION.

## Nos. 98–7330–TX–C–5, 99–4021–CV–C–5.

United States District Court,
W.D. Missouri,
Central Division.

Jan. 14, 1999.

Nancy E. Kenner, Sylvester James, Jr, Kenner, James & Kavanaugh, P.C., Kansas City, MO, Michael P. Bastian, Daniel T. Dalton, St. Louis, MO, for Phillip–Johnson, plaintiff.

Nancy E. Kenner, Sylvester James, Jr, Paul F. Kavanaugh, Kenner, James & Kavanaugh, P.C., Kansas City, MO, Michael P. Bastian, Daniel T. Dalton, St. Louis, MO, for Von Wesley Watson, plaintiff.

M. Corinne Corley, Corley Law Firm, Kansas City, MO, for Sykura, Officer, Gilbert, Corporal, Kirgan, Bedford, Officer, Sherman, Nurse, Carl – White, Limestone County, Texas, defendants.

Michael M. Pritchett, Hearne & Pritchett, P.C., Poplar Bluff, MO, for Dora Schriro, defendant.

Thomas M. Mingus, Walther, Antel, Stamper & Mingus, Columbia, MO, for Gary Allen, defendant.

Robert J. Buckley, Knight, Ford, Atwill, Parshall & Baker, L.L.C., Columbia, MO, for Alan Earls, defendant.

David S. Baker, Sherman, Taff & Bangert, P.C., Kansas City, MO, for Karen Cunningham, parties immediately above are engaged individually and in his or her official capacity, defendant.

M. Corinne Corley, Corley Law Firm, Kansas City, MO, for Capital Correctional Resources, Inc., defendant.

Craig R. Heidemann, Douglas, Lynch, Haun & Kirksey, P.C., Bolivar, MO, Stephen M. Ryals, Ryals & Soffer, St. Louis, MO, Frank K. Carlson, Carlson & Hellmann, Union, MO, Gary R. Sarachan, Rothman, Sokol, Adler & Sarachan, St. Louis, MO, John P.

Poland, Baker Sterchi Cowden & Rice, L.L.C., St. Louis, MO, Sylvester James, Jr, Kenner, James & Kavanaugh, P.C., Kansas City, MO, for defendants.

## MEMORANDUM AND ORDER APPROVING CLASS SETTLEMENT AND ORDERING PAYMENT OF ATTORNEY FEE

LAUGHREY, District Judge.

Beginning in 1995, the State of Missouri contracted with various Texas counties and a city to house inmates who had been committed to the custody of the Missouri Department of Corrections ("DOC"). Some of these counties in turn contracted with private jail companies to operate the facilities where the Missouri prisoners were housed. Under the Texas Cell Lease Program, more than 2100 Missouri prisoners were transferred to Texas and several have claimed that their civil rights were violated while they were in Texas facilities and during their transportation to Texas. More than 700 of these prisoners are plaintiffs in pending lawsuits in state and federal court. After protracted litigation, the Court conditionally certified a class action to address all claims arising out of the Texas Cell Lease Program. That class action has now been settled and pending before the Court is a Joint Motion for Approval of Class Settlement. For the reasons explained in this Order, the Court will approve the settlement.

### I. *Factual Background*

#### A. The Mistreatment of Missouri Prisoners Sent to Texas

This litigation was catalyzed by a videotape of an incident which occurred on September 18, 1996, at the Brazoria County, Texas, jail. The videotape shows a large group of officers dressed in riot gear entering a pod full of prisoners and ordering them to lie on the floor. The officers are armed with stun guns and at least one German Shepherd dog. Some of the officers worked for Capitol Corrections Resources, Inc. ("CCRI"), a private jail company, and some for the Brazoria County sheriff, E.J. "Joe" King. At no time do the prisoners offer any resistance.[1] They are forced by the officers to leave their pod by crawling on their stomachs, single file, in front of the barking dog. In the hallway, they are forced to lie down in rows on their stomachs. Prisoners who move too slowly are kicked in the side or between their legs by officers shouting obscenities. Without provocation, one officer steps on a prisoner's back to force him closer to the ground. After a period of time, the prisoners are stripped and subjected to body and cavity searches. These graphic searches are conducted in full view of several officers and other prisoners and recorded on camera.[2] After the searches, the nude inmates are ordered to crawl back to their bunks where they are required to lay nude for two more hours on steel bunks that have been stripped of mattresses and bedding. This process is then repeated in the next pod. Although the inmates are behaving peacefully, some playing a game of cards, the guards use tear gas against them. The inmates, obviously experiencing pain from the gas, are then subjected to the same process of crawling into the hall and then back to their pod to be strip searched. During one of these searches, a prisoner with a broken ankle is dragged out of a room by his arm. The video camera shows the German Shepherd biting prisoners and captures the sound of stun guns being used. *See also, Kesler v.*

1. It is unclear why the pods were being searched. One Texas official said that the smell of marijuana was detected coming from a specific pod. Chief Deputy Wagner of the Brazoria County Sheriff's Department stated that the butt of a marijuana cigarette was discovered during the search of that pod. The shakedown, however, also involved pods other than the one where the smell of marijuana originated. There is no evidence to explain why the additional pods were searched. The videotape documents that no prisoner was disruptive when the guards entered these additional pods. No action was ever taken concerning the marijuana butt and it was not preserved as evidence.

2. Officials first described the videotape which recorded these events as a training video, even though it has since been demonstrated that the tape was not done for training purposes. This admitted mischaracterization was suggested by Sheriff King in an effort to "explain away the "bad scene" created by the existence of the videotape." *Kesler,* 29 F.Supp.2d at 365 n. 18.

*King,* 29 F.Supp.2d 356 (S.D.Tex.1998) (describing the occurrence in the Brazoria County facility).

There is a videotape of a similar incident in Gregg County, Texas, which occurred on March 2, 1997. This video shows similar mistreatment of prisoners. Some prisoners are gassed as an apparent disciplinary measure. One tape shows a prisoner wailing in pain after this treatment for a lengthy period of time. Another shows guards hitting inmates with streams of water from fire hoses. The Gregg videotapes also show prisoners being subjected to strip searches and some are beaten and kicked.

At the class action fairness hearing, several Missouri prisoners testified about their experiences in Texas under the Cell Lease Program. These prisoners described being taken from their cells in Missouri and subjected to an eighteen hour bus ride to Texas. During the trip, they were not allowed to use toilets, but instead had to relieve themselves in a large bucket or can. Those who were sent to the Brazoria facility complained of being abused by a Lieutenant Wallace, who was infamous for kicking prisoners with his steel-toed boots. For example, Daniel Owsley testified that Wallace called him a nigger, sprayed him with mace, and kicked him in the head in response to his request to attend his grandfather's funeral. Owsley testified that this abuse causes him to suffer from recurring grand mal seizures. Lieutenant Wallace had previously been convicted and imprisoned for using excessive force against inmates, yet he was given a position of authority at the Brazoria facility, even though the warden at the Brazoria County facility was aware of Wallace's background.

Many prisoners complained of being subjected to electrical shocks during searches, and sprayed with mace and fire hoses for minor infractions. Dwight E. Cofer testified that, because one prisoner in a pod refused a tray of food, guards sprayed the entire group with mace. John Reed testified that he was slammed against a wall, told that he would learn to love Texas, and threatened that he would become a missing person. Others complained about being bitten by dogs. Kevin Kisling testified that he was bitten by a dog and assaulted by another inmate. Ronald Hellm and Michael Daugherty testified that German Shepherds were sent into pods unrestrained, and encouraged to bite and intimidate prisoners. Darrin Michael Sutton claimed that he was hog-tied for 17 hours for refusing to sign a conduct violation.

There were also complaints about prison conditions and inadequate medical care. Several prisoners explained that in Texas, unlike Missouri, there was no segregation of prisoners by levels which meant that non-violent criminals with short sentences were housed with violent inmates with multiple life sentences. Charles W. Shaw, Jr., was transferred to Texas despite a serious medical problem and was denied medical treatment there. He stated that he contracted pneumonia in Texas and almost died from the infection because he was left without care or adequate blankets for almost a week. Several prisoners described their arrival at the Brazoria County jail where they were forced to kneel outside for hours with temperatures in the thirties and then forced to say that they loved Texas. Those that did not were hit by their guards.

Several of these inmates testified that they complained to Missouri officials, either directly or through their families, but no one would believe them. There was evidence that grievances were not seriously addressed and some grievances were stolen from the locked grievance box that were only accessible to Texas prison officials. Missouri inmates were told that if they kept complaining to their families, they would lose phone privileges.

The Court has also reviewed the documents compiled during the State of Missouri's investigation of the incidents at the Brazoria and Gregg County facilities. These documents further substantiate the inmates' allegations of abuse and mistreatment in Texas. The investigation also demonstrated a gross lack of oversight by Missouri DOC officials. Even though the DOC had been repeatedly contacted by Missouri prisoners, their families and religious leaders, about the conditions in the Texas jails, the DOC failed to conduct a serious investigation. For example, one Missouri official was aware that

there was a videotape of the Brazoria County incident, but did not follow up when Sheriff King failed to produce the videotape when requested to do so. It was not until the videotapes were released to the media that the State of Missouri terminated the Cell Lease Program and returned its prisoners to Missouri.

## B. The Resulting Litigation

Hundreds of prisoners filed suits complaining about their treatment in Texas. Some were filed in the Southern District of Texas, some in the Eastern District of Missouri and some in the Western District of Missouri. Some were also filed in state courts. Several of these suits were consolidated for pretrial procedures before this Court, and discovery has proven to be ponderous, time-consuming and expensive. For example, the State of Missouri took the position that it was going to depose every Plaintiff and potential witness and the depositions taken before settlement had each lasted several hours. At one point, counsel anticipated spending virtually all of their waking hours attending these depositions for weeks on end. There were also voluminous documents relevant to the dispute. During this difficult litigation, the law firm of Shook Hardy & Bacon admirably agreed to serve as a depository for thousands of these documents, greatly facilitating the progress of the litigation. The Court thanks Shook for its generous dedication of resources to these cases.

Faced with daunting litigation costs, the parties in the consolidated cases sought a more effective tool to resolve their dispute. The chosen vehicle was a settlement class action. On July 20, 1999, Plaintiffs filed an amended complaint in one of the consolidated cases and subsequently filed a joint motion for conditional certification of a settlement class and a joint motion for approval of the settlement.

The class consists of all Missouri inmates sent to Texas between January 1, 1995, and December 31, 1997, including both inmates who have filed individual suits and those that have not. The named Defendants are certain Missouri officials, the private prison companies that housed Missouri inmates in Texas, certain Texas counties with which the State of Missouri contracted, and a private company that transported Missouri inmates to Texas. The Class Complaint asserts that the civil rights of the class members were violated by their conditions of confinement and treatment during their transportation to Texas and in the Texas prison facilities. It also alleges that the class members are third-party beneficiaries of some of the contracts between the State of Missouri and the Texas entities, and alleges the Defendants breached these contracts.

The Class Complaint seeks both equitable and legal relief. The class also seeks actual, compensatory, and punitive damages, as well as reasonable attorney fees and costs. On July 29, 1999, the Court granted the Joint Motion for Conditional Certification, and provisionally certified the following mandatory plaintiff class under Federal Rule of Civil Procedure 23(b)(2):

> A class of individuals comprised of every Missouri Department of Corrections inmate who was ever transferred, housed, assigned, or relocated (or who has or ever will claim to have been transferred, housed, assigned, or relocated) to any correctional facility anywhere in the State of Texas between January 1, 1995 and December 31, 1997 for any length of time whatsoever, whether or not any particular member of that class is still in the custody of the Department.

[Doc. 107]. The parties agree that final approval of the settlement of this class action will bar any pending or future litigation regarding any of the incidents involving Missouri prisoners housed in Texas or transported to Texas under the Cell Lease Program.

## C. Settlement

Under the proposed settlement, the Defendants agree to refrain from taking certain actions in the future. The State of Missouri agrees not to contract to house class members in Texas, other than on an individual basis pursuant to the Interstate Corrections Compact ("ICC"). The moratorium on sending prisoners to Texas will last five years, ending on June 15, 2004. During that five-year period, Missouri prisoners will only be

transported to other states under the ICC if it is necessary to transfer them outside of the State of Missouri for their protection or to answer charges in another state. Similarly, Brazoria County and Gregg County, Texas, as well as Dove Development Corporation ("Dove") and CCRI (collectively known as the "Texas Defendants") agreed not to accept Missouri inmates other than those sent to Texas under the ICC. With respect to any class members sent to Texas under the ICC, the State of Missouri and the Texas Defendants agree to take all reasonable steps to ensure that the facility housing a class member does not employ anyone convicted of a crime involving abuse, neglect, or assault upon an inmate. The State of Missouri also agrees to set up a process to review claims by inmates about conduct violations that may have been unfairly issued while they were confined in Texas. Finally, Missouri and the Texas Defendants agree not to pursue any claim for reimbursement of a class member's costs of incarceration from the funds awarded pursuant to the settlement.

In response to an inquiry from the Court, the Defendants have agreed that these equitable agreements are enforceable as contracts despite the Prison Litigation Reform Act ("PLRA"). Defendant Dora Schriro acknowledged that the Settlement Agreement was a "private settlement agreement" rather than a "consent decree" under PLRA, and that it could therefore be enforced in state court. *See* 18 U.S.C. § 3626(g)(6); [Doc. 111]. The Settlement Agreement itself states that "[a]ny action for breach of this agreement may only be filed in the Circuit Court for Cole County, Missouri." [Doc. 96, Ex. A at 12]. Class counsel concurred that the Settlement Agreement was a private settlement agreement enforceable in state court. [Doc. 113].

The Settlement Agreement also includes $2,220,000 to be paid into a Texas Inmate Litigation Settlement Fund. The Agreement proposes that $900,000 be allocated to attorney fees for class counsel, $300,000 be available for class administration expenses, and the remaining $1,020,000 be divided among the class members. These funds would be divided among three groups of class members: (A) all inmates confined in the State of Texas who submit a claim for monetary compensation; (B) all inmates who submit a claim for monetary compensation and who were confined in any of the cell blocks that were searched by law enforcement personnel at the Brazoria County Correctional Center on September 18, 1996, and/or the Gregg County Correctional Center on March 2, 1997; (C) all inmates who incurred significant physical injuries and who submit a claim form for damages. Groups A and B would initially be provided $100,000 each to be divided among all claimants. Group A would be compensated on a *per diem* basis, while Group B would be compensated on a *pro rata* basis. Group C would be provided $820,000 to be allocated to Group members by magistrate judges. In the event that the money provided to Group C exceeded the value of the Group's claims, that amount would then be divided between Groups A and B. Class members who submit claims in Group C could not submit claims under Groups A or B. The other class members could submit claims under Groups A, B, or both.

### D. Notice and Opportunity to be Heard for Class Members

On August 26, 1999, the Court approved a Notice to the class members regarding the proposed settlement. [Doc. 118]. In addition to describing the settlement, the Notice explained that class members could obtain more information at the Office of the Clerk for the Western District of Missouri or at their prison law libraries.[3] An objection form was attached to the Notice, and objectors were notified that any objections must be filed with the Court by October 25, 1999. On September 8, 1999, this Notice was sent to the Division of Family Services Office in each county of the State of Missouri for posting. [*See* Doc. 120]. The next day, the Notice was mailed to individual class members living in the custody of the Missouri Department of Corrections. [*See* Docs. 127

---

**3.** With the consent of class counsel and cooperation of defense counsel, the Court sent notebooks containing all of the documents relevant to the class action and the settlement to each prison library in the State of Missouri in September 1999.

and 142]. If a class member was no longer in the custody of the DOC, the Notice was mailed to their last known address. The Notice was subsequently published in *The Kansas City Star*, *The Call*, *The St. Louis American*, and the *St. Louis Post–Dispatch*.

By October 25, 1999, the Court had received approximately 170 objection forms from the 2100 class members, meaning that about 8 per cent of the class objected to the settlement. Many objectors complained that the amount of money allocated to the class was insufficient to compensate for their injuries in Texas. A related and also common objection was that too much of the settlement fund had been allocated to attorney fees and costs. A few of these objectors noted that class counsel would receive more under the settlement than had been contemplated in their fee agreements with their own attorneys. A large group of the objectors simply described their treatment in Texas, recounting incidents of physical and verbal abuse by guards and other inmates, denial of medical care and access to courts, and separation from their families in Missouri. Some objection forms stated no specific objection, or merely requested additional information about the settlement. A significant group of objectors were offended that the State of Missouri had not admitted liability or contributed funds to the settlement. Some class members objected that class counsel were not adequately representing their interests. On November 10, 1999, in responses to this concern, the Court appointed attorney John W. Kurtz to represent the objectors at the fairness hearing.

A fairness hearing was held on December 3, 1999. Class counsel, defense counsel, and the attorney for the objectors were allowed to present argument and evidence to the court. Class counsel first presented testimony from Richard H. Ralston, an experienced and highly regarded mediator who helped to negotiate the class settlement. Ralston testified that, in his former occupation as a federal magistrate judge, he had handled the prisoner docket in Jefferson City, Missouri, the venue where the consolidated cases would

have been tried. Ralston testified that, in his experience, jurors in this venue awarded damages to prisoners only in serious cases involving documented beatings or the deliberate denial of medical care. Ralston recalled one particular case, involving a prisoner named Ronald Parton, in which the jury awarded $80,000 in damages. The Parton case involved very serious injuries, an articulate, attractive plaintiff and clear evidence of abuse. Ralston testified that, in general, prisoner cases resulted in defense verdicts or small verdicts of less than $15,000. He explained that jurors in this venue view prison cases with a "jaundiced eye." Ralston served as a magistrate judge in the late 1970s and early 1980s, before the enactment of the Prison Litigation Reform Act.

Ralston testified that he began mediating the Texas prisoner cases approximately one and one half years ago. During the mediation, the State of Missouri adamantly refused to contribute any money to the settlement, and so the mediation focused on equitable relief that the State could provide. Missouri refused to permanently forego its right to send inmates to Texas again, but was amenable to providing other kinds of nonmonetary relief.

According to Ralston, there was also a serious question about the ability of Texas counties to pay any money toward the settlement. Settlement funds were available, however, from the private prison corporations in the suit. These corporations agreed to contribute $2.2 million, which was the limit of their primary insurance policies and included some funds from their excess carriers. The transportation company defendant took the position that it had done nothing wrong, but that it would contribute a small amount of money to avoid the nuisance of trying the cases.

Class counsel next presented testimony from Lisa Dahl, a jury consultant[4] who conducted a focus group to determine the likely attitudes of jurors in this venue to the prisoners' cases. The focus group included seven individuals representing a cross-section of the likely ages and genders that would be

---

4. Dahl holds a bachelor's degree in political science and a masters' degree in litigation science.

She has been employed as a jury consultant since 1991, and is well known in the Kansas City area.

found on a venire. [Pl.'s Ex. 4]. On October 14, 1998, this group was shown a videotape of how class members had been treated in Texas. The focus group clearly viewed the prisoners' claims with a jaundiced eye. Most believed that prison ordinarily included such treatment, and a majority thought the prisoners should receive little, if any, compensation. The focus group did not seem to be bothered by what they saw on the videotapes. Dahl testified that, in her professional opinion, if even a few people with such attitudes were on a jury, they would either hold out for a defense verdict or insist on a compromise verdict with lower damages for the Plaintiff. Although Dahl's research was not designed to be a predictive test, it underscores Ralston's view that mid-Missouri juries rarely award any damages to prisoners.

Four attorneys who had participated in the negotiation of the settlement made presentations to the Court. John Mollenkamp, representing the State of Missouri, explained that the State would never pay any money to settle the prisoners' cases. He stated that the State has a policy of refusing to offer money to settle any prison claims even if they are meritorious and recounted an incident in which the State insisted on trying a case that the plaintiff had been willing to settle for $27. According to Mollenkamp, this policy has reduced the number of prison suits that are filed. Sylvester James, who represented hundreds of Plaintiffs in the consolidated cases, testified that settlement negotiations were hard fought. He recounted that Missouri laughed when class counsel requested that sentences be shortened as part of the settlement, and that Missouri was steadfast in its refusal to permanently give up its right to send prisoners to Texas, despite being asked to do so dozens of times. James explained to the Court that the attorneys spent days on end together, arguing heatedly over the settlement. Finally, Craig Heidemann explained to the Court that class counsel had expended an enormous amount of time litigating their clients' cases. Heidemann presented an exhibit summarizing the number of hours worked by class counsel, which showed that if the Court awarded the requested $900,000 in attorney fees, each class counsel would lose approximately $97,-000 worth of services because of their participation in this litigation. Finally, Frank Carlson submitted evidence about the number of class members who received serious physical injuries in Texas. Plaintiffs' Exhibit 7 summarized the injuries of the 59 inmates believed to constitute most of Group C. Several of the injuries were caused by stun guns, dog bites, tear gas, mace, or blows by guards. Most of these occurrences resulted in pain and soft tissue injuries causing symptoms such as back pain. Carlson admitted, however, that he was unaware of how many members of the class would actually qualify for membership in Class C.

John Kurtz presented the objectors' case at the hearing. His presentation was exhaustive and his advocacy eloquent. The Court thanks Mr. Kurtz for his willingness to represent the objectors at the hearing. The following objectors were allowed to address the Court via closed circuit television: Darrin Michael Sutton; Michael Daugherty; Louis Thomas; Dwight E. Cofer; Ray Tilley; Richard Porter; Charles W. Shaw, Jr.; Courtland Harral; Jay C. Wheeler; Roland Davis; Rodney W. Marlett; John Reed; Daniel Owsley; Ronald Hellm; and Kevin Kisling. Kenneth Thompson, a class member who has been released from prison, addressed the Court in person. Overall, the objectors' testimony about their treatment in Texas was starkly similar and compelling. The objectors' most important complaint was that the State of Missouri did not contribute any money to the settlement and refused to accept any responsibility for its lax oversight. The objectors were also dissatisfied with the amount of money allocated to the settlement fund because their injuries were so severe that there would not be enough money in the fund to adequately compensate them. Most preferred to have their cases tried rather than be settled. Many were frustrated that they could not opt out of the class. Some expressed concern about the amount of money being paid out of the settlement to class counsel as fees and costs. They believed that class counsel had earned their fee but there was not enough money in the fund to cover the prisoners' damages and the attorney fees and expenses. Some stated that

they wanted to take their cases to trial because they believed that they, as well as their attorneys, would get more money if the cases were tried rather than settled.

## II. *Legal Standard*

█ Because this class action may not be settled without the Court's approval, it is the Court's obligation to determine whether the proposed settlement is fair, reasonable, and adequate. *Grunin v. International House of Pancakes,* 513 F.2d 114, 123 (8th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); Fed.R.Civ.P. 23(e) (1999) ("[a] class action shall not be dismissed or compromised without the approval of the court."). Under Rule 23(e), "the district court acts as a fiduciary which must serve as a guardian of the rights of absent class members." *Grunin,* 513 F.2d at 123. To determine whether to approve the Settlement Agreement, the Court must consider the following factors: "the merits of the plaintiff's case, weighed against the terms of the settlement; the defendant's financial condition; the complexity and expense of further litigation; and the amount of opposition to the settlement." *Van Horn v. Trickey,* 840 F.2d 604, 606 (8th Cir.1988) (*citing Grunin,* 513 F.2d at 124). The public interest is also a factor that should be considered in evaluating a class action settlement. *Angela R. by Hesselbein v. Clinton,* 999 F.2d 320, 324 (8th Cir.1993).

## III. *Discussion*

█ Applying the *Grunin* factors to the Settlement Agreement demonstrates that it is fair, reasonable and adequate. The Court is convinced that the class members will receive more compensation through settlement than trial. Further litigation would also be highly complicated and expensive for both the parties and the public. Finally, only a small percentage of the class members have objected to the settlement.

### A. The Merits of the Plaintiffs' Cases

█ Balancing the merits of the plaintiff's case against the terms of the settlement is "the single most important factor in determining whether a settlement is fair, reason-

able, and adequate." *Van Horn,* 840 F.2d at 607. Because the purpose of settlement is to avoid the delay and expense of a trial, however, the Court "need not resolve all of the underlying disputes, ... and the value of the settlement need not be determined with absolute precision." *DeBoer v. Mellon Mortgage Co.,* 64 F.3d 1171, 1178 (8th Cir.1995), *cert. denied,* 517 U.S. 1156, 116 S.Ct. 1544, 134 L.Ed.2d 648 (1996) (*citing Grunin,* 513 F.2d at 123–24).

The greatest strength of the Plaintiffs' claims are the videotapes. These videotapes document behavior which the United States Constitution forbids. On the other hand, only a small minority of the class members were shown on the tapes. Some class members were not even housed in the Brazoria and Gregg County facilities, but were sent to other counties in Texas. In the absence of concrete documentation, allegations of abuse are difficult to establish. This is not to say that undocumented abuse does not occur, only that it is more difficult to ascertain the truth and that works to the disadvantage of the class members who would carry the burden of proof at trial.

These proof problems must also be evaluated in the context of mid-Missouri, the place where most of these lawsuits would be tried. Both Lisa Dahl and Rich Ralston demonstrated that it is difficult to convince a mid-Missouri jury that a prisoner's Constitutional rights have been violated. For example, members of the jury focus group were neither shocked nor dismayed when they saw the videotape. More than one commented that a prisoner's life should be punitive. While the focus group was not scientifically selected, and a real jury would have been drawn from a broader geographic area, the attitude expressed by the focus group is consistent with the experiences of this Court and Rich Ralston, who handled the mid-Missouri prisoner docket for many years.

Even the federal government had difficulty convicting the guards who were shown abusing prisoners on the Brazoria County tape. The criminal trial against Lieutenant Wallace resulted in a misdemeanor conviction for a civil rights violation, the least serious charge filed by the government. The government

dismissed criminal charges against the handler of the German Shepherd who is shown on the videotape biting one of the Missouri inmates during 1996 incident at the Brazoria County Jail. The dismissal followed a hung jury which voted 10–2 in favor of acquitting the dog handler. The Brazoria County guard, who indiscriminately used the stun gun on prisoners, pled guilty to a misdemeanor conviction. While the burden of proof in a criminal trial is higher, the outcome of these criminal cases is evidence of the uphill battle which class members would face in individual trials.

Even if the prisoners could factually establish their claims, the PLRA would preclude most of them from getting damages against those who violated their Constitutional rights. Under the PLRA, "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). At least one of the Circuit Courts of Appeals has interpreted the term "physical injury" in a manner that would probably preclude recovery for emotional pain and suffering for the members of Groups A and B. *Siglar v. Hightower*, 112 F.3d 191, 193–94 (5th Cir. 1997) (sore, bruised ear was *de minimus* injury and PLRA therefore barred recovery). Because Groups A and B, by definition, include prisoners who did not experience significant physical injuries in Texas, these class members' claims for damages for their emotional trauma could be barred by the PLRA.

The PLRA would also deeply restrict this Court's ability to award injunctive relief if the class prevailed on the merits. Under the statute, any injunction in a prison case designed to prevent future harms is labeled "prospective relief," and is subject to the following limitations:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than

necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

18 U.S.C. § 3626(a)(1). In addition, such relief must ordinarily terminate after two years, unless a court finds that its continuation is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." § 3626(a)(2). This restriction would likely prevent the Court from enjoining the State of Missouri from sending prisoners to the State of Texas, because such an injunction would not be narrowly drawn. Because of the statute, the Court would likely be confined to less sweeping remedies, such as requiring the State of Missouri to investigate and monitor Texas facilities to which it would send groups of prisoners. Even that kind of an injunction would likely be dissolved after two years because of the PLRA's time limitation.

Furthermore, to prevail on their Eighth Amendment claim for cruel and unusual punishment, Plaintiffs would be required to show that they were subjected to "malicious and sadistic" treatment. *See, e.g., DeGidio v. Pung*, 920 F.2d 525, 532 (8th Cir.1990). An official exhibits sadism by "delighting in cruelty," or inflicting pain "for one's own pleasure." *Parkus v. Delo*, 135 F.3d 1232, 1234 (8th Cir.1998), *cert. denied*, 525 U.S. 863, 119 S.Ct. 152, 142 L.Ed.2d 124 (1998) (*quoting Douglas v. Owens*, 50 F.3d 1226, 1232–33 n. 13 (3rd Cir.1995)). Sometimes, even prisoners who have been subjected to abuse by guards find their cases dismissed on summary judgment because they have failed to meet this very high standard. The case of *Samuels v. Hawkins*, 157 F.3d 557 (8th Cir. 1998) (M. Arnold, dissenting), is illustrative. In *Samuels*, a prisoner alleged that he was shackled to a cell bed on his back, with his arms chained and handcuffed at his sides for four hours. *Id.* at 558. An officer then entered his cell and asked whether he was serving a life sentence. *Id.* at 559. When the prisoner responded that he was, the guard threatened "I'm gonna make sure you never see again!" and threw a cup of clear

liquid at him. Because of his restraints, the prisoner was unable to shield his face or his eyes. The liquid caused the inmate's eyes to burn, and he feared that he would be blinded. Nevertheless, the Eighth Circuit did not allow this case to be decided by a jury. As a matter of law, the guard's behavior was not malicious and sadistic. *Id.* at 588. Thus, the excessive force claims of many of the class members may have been dismissed on summary judgment.

Many of the prisoners' other claims, including their civil rights claims against the officials of the State of Missouri, would likely have been adjudicated under a deliberate indifference standard.[5] Deliberate indifference is *actual* knowledge of a substantial risk and an *intentional disregard* of that risk. *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Liebe v. Norton,* 157 F.3d 574, 577 (8th Cir.1998) (applying deliberate indifference standard to suit against state officials for failure to protect prisoner from abuse). This standard is higher than negligence or recklessness. *Liebe,* 157 F.3d at 577. Although the Court has seen evidence of multiple complaints to State of Missouri officials, it is far from certain that prisoners would have been able to prove that these officials knew about the problems in Texas and intentionally ignored them.

Finally, as previously noted, juries in this venue are generally unsympathetic to claims by prisoners. The testimony of Lisa Dahl and Richard Ralston at the fairness hearing leads to the conclusion that any verdicts awarded to the prisoners if their cases were tried would not involve large awards of damages, even if significant injuries were proven.

Weighed against the legal difficulties of the Plaintiffs' case, the benefits provided in the settlement appear to be fair. The $2.22 million dollar settlement fund is a reasonable estimate of the monetary value of the cases. Furthermore, the nonmonetary relief likely exceeds what this Court would have the power to order if Plaintiffs won at trial.[6] Groups A and B almost certainly would receive no money if their cases were tried, but under the terms of the settlement they will benefit from the injunctive relief in the settlement, and will also receive some compensation. Group C would face significant risk if its cases were tried, but through settlement, Group C enjoys the same injunctive relief as Groups A and B and will receive the majority of the money allocated to damages. These monetary and nonmonetary benefits appear fair when weighed against the almost overwhelming legal and practical obstacles to recovery in individual cases. While the settlement does not compensate the class members for what they believe they are entitled, the Court is convinced that they will receive more money and more injunctive relief by settlement than litigation and will get the relief more quickly.

---

5. The prisoners did present other theories for recovery, but these theories also suffer from legal difficulties. For example, the prisoners argued that they were third party beneficiaries of the contracts between the State of Missouri and various Texas facilities. This was a novel argument.

6. The nonmonetary relief will be enforceable in a state court proceeding, if necessary. Although the PLRA restricts the scope and duration of relief that federal courts may order pursuant to consent decrees or other judgments in prison cases, the Settlement Agreement in this case is exempt from those restrictions because it is a private settlement agreement rather than a consent decree. Under the PLRA, a consent decree is defined as "any relief entered by the court that is based in whole or in part upon the consent or acquiescence of the parties but does not include private settlements." 18 U.S.C. § 3626(g)(1). By contrast, a "private settlement" is "an agreement entered into among the parties that is not subject to judicial enforcement other than the

reinstatement of the civil proceeding that the agreement settled." § 3626(g)(6). Parties may enter private settlement agreements that do not comply with the limitations on prospective relief that may be ordered by a court. § 3626(c)(2). Private settlements are enforceable in state court. § 3626(c)(2)(B); *Austin v. Hopper,* 28 F.Supp.2d 1231, 1236 (M.D.Ala.1998). Both class counsel and defense counsel agree that the Settlement Agreement was intended to be a private settlement agreement. Further, the Settlement Agreement specifically states that it shall be enforceable in Missouri state courts. Having considered the parties' briefs, the Court therefore rules that the Settlement Agreement is a private settlement agreement that may be enforced in state court. Further, the Settlement Agreement need not comply with the PLRA's limitations on prospective relief. By settling, the Plaintiffs clearly obtained more effective injunctive relief than they could have obtained from the Court.

## B. The Defendants' Financial Condition, the Complexity and Expense of Further Litigation, and the Amount of Opposition to the Settlement

The financial condition of the Defendants generally weighs in favor of approving the settlement. Defendant CCRI contributed $2 million, which was the limit of its insurance policy, as well as $100,000 from its excess carrier. Other private Defendants contributed a total of $120,000. By all accounts, these amounts were agreed to by class counsel only after days of grueling, face-to-face negotiations. Class counsel had serious concerns about the financial ability of the Defendant counties in Texas to contribute any money whatsoever. The State of Missouri, however, which contributed no money to the settlement, clearly had the financial ability to do so. It is clear to the Court, however, that the State would not have agreed to pay anything to settle these cases, regardless of its financial condition.

The complexity and expense of further litigation weighs strongly in favor of approval of the settlement. While overseeing discovery in the consolidated cases, the Court's resources were strained. The parties' resources were stretched to the limit. Counsel examined thousands of pages of documents, responded to dozens of interrogatories, and had begun the process of deposing more than a thousand witnesses. At the time that the class action complaint was filed, no one had yet developed a satisfactory plan for how these cases could be tried. In all likelihood, the bulk of these cases would have been tried individually, assuming they survived summary judgment.

Finally, the amount of opposition to the settlement weighs in favor of approving the settlement. The objectors represent only about 8 per cent of the class, and this relatively low level of opposition to the settlement also indicates its fairness. The Court has an obligation not only to the minority of class members who filed objections, but also to the majority who, by their silence, indicated their approval of the Settlement Agreement. *DeBoer*, 64 F.3d at 1178 (*citing Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 23–24 (2d Cir.1987)).

## C. The Public Interest and the Objectors' Arguments

The Court has also considered the public interest and the objectors' arguments and concludes that they do not warrant rejection of the Settlement Agreement.

### 1. The State of Missouri's Approach to This Litigation

The objectors' primary complaint about the settlement was the State of Missouri's attitude throughout this litigation. Several objectors wanted the State to accept responsibility for what happened to them in Texas. The Court construes this argument as a claim that the settlement violates the public interest by allowing a wrongdoer to go relatively unpunished.

Settlements, however, rarely involve admissions of liability or apologies, and this one is no exception. By its action, the State has acknowledged the problems in the Texas Cell Lease Program. The State of Missouri has voluntarily retrieved all of its prisoners from the Texas Cell Lease Program. In settlement, it has agreed not to send any prisoners to Texas except on an individual basis under the ICC. It has also agreed not to send any Missouri inmates to Texas facilities employing guards with criminal convictions for assaulting prisoners and not to seek reimbursement from the settlement fund for the costs of incarcerating the class members. Without such an agreement, the State could likely recover damages paid by the private prison facilities to the class members. It is true that the Eighth Circuit has held that Missouri may not seek reimbursement from funds that the State pays to inmates with successful claims under § 1983. *See Hankins v. Finnel*, 964 F.2d 853, 861 (8th Cir.), *cert. denied*, 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992) (holding that § 1983 preempted the Missouri Incarceration Reimbursement Act). However, that holding said nothing about whether Missouri could garnish funds paid to prisoners by a private jail company or officials in another state. Thus, in a real sense, the State of Missouri has given up more than $1 million to settle this case. Given the significant, if not over-

whelming, relief offered by the State in the Settlement Agreement, public policy does not compel rejection of the settlement.[7]

### 2. Whether the Settlement Fund Will Adequately Compensate Class Members

Many objectors are concerned that the settlement provides insufficient funds to compensate the class members and that too much of the settlement funds have been allocated for attorney fees. Some have argued that the attorney fees should not be subtracted from the settlement funds at all, while others have noted that class counsel is seeking a higher proportion of the class settlement than their individual attorneys agreed to accept for litigating their individual cases.[8] Finally, some have objected that their individual attorneys will seek a percentage of their share of the settlement proceeds under a contingent fee agreement, even though attorney fees have already been subtracted from the settlement fund. They state that it would be unfair to allow such a double recovery for the attorneys. Because the issues of attorney fees and compensation for the class members are interrelated, the Court considers them together.

The Settlement Agreement purports to allocate almost 41 percent of the settlement fund, or $900,000 to attorney fees. It also includes $300,000 for costs and class administration expenses. If this request were granted, fees and costs[9] would consume 54 percent of the settlement proceeds, leaving $1,020,000 to be distributed among the 2100 class members. Because the amount of attorney fees to be paid from a common fund is for the Court to determine, *Johnston v. Comerica Mortgage Corp.*, 83 F.3d 241 (8th Cir.1996); *In re General Motors Corp. Pick–Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 819 (3rd Cir.1995); *In re The Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F.Supp. 572 (D.N.J.1997) the Court will con-

strue the Settlement Agreement and the documentation presented by class counsel at the fairness hearing as a request for attorney fees and expenses in the amount of $1,200,000.

When awarding attorney fees in class actions, courts must ensure that class counsel are compensated adequately but not excessively:

> Since in most class actions the fees have been deducted from the total class recovery under the "equitable fund" theory (in connection with Rule 23), the primary concern has been to establish standards which can be used to insure that these awards reasonably compensate the attorneys for their services yet are not excessive, arbitrary, or detrimental with respect to the class.

*Grunin*, 513 F.2d at 127. In class action cases, courts may use either a "lodestar" method or a "percentage of benefit" method to calculate reasonable fees. *Johnston*, 83 F.3d at 245. The lodestar method is based on "the consideration of hours and rates." *Id.* In applying this method, courts multiply a reasonable number of hours for a case by a reasonable rate for the attorneys' work. Under the percentage of benefit method, courts may issue "an award of fees that is equal to some fraction of the common fund that the attorneys were successful in gathering during the course of the litigation." *Id.* at 244–45.

In "common fund" cases, where attorney fees and class members are distributed from one fund, the Eighth Circuit has indicated that a percentage of the benefit method may be preferable to the lodestar method. *Id.* at 245; *accord Camden I Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991). The Supreme Court has indicated, in *dicta*, that this method should be applied in common fund cases. *Blum v. Stenson*, 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 79

---

7. In the future, it will also be difficult for Missouri to claim ignorance of problems at an out-of-state or private facility if confronted with the kind and quantity of complaints it received as a result of the Texas Cell Lease Program.

8. Class counsel in this case originally represented individual plaintiffs under contingent fee agreements.

9. Evidence was presented at the fairness hearing that costs were expected to consume all of the $300,000 allocated to them.

L.Ed.2d 891 (1984) ("Unlike the calculation of attorney's fees under the 'common fund doctrine,' where a reasonable fee is based on a percentage of the fund bestowed on the class, a reasonable fee under § 1988 reflects the amount of attorney time reasonably expended on the litigation."). A Third Circuit task force concluded that the percentage of benefit method should be applied in common fund cases for the following reasons:

[A] key element of the common fund case is that fees are not assessed against the unsuccessful litigant (fee shifting), but rather, are taken from the fund or damage recovery (fee spreading). Furthermore, in contrast to the calculation of a statutory fee, payable by the defendant depending on the extent of success achieved, a common fund is itself the measure of success ... [and] represents the benchmark on which a reasonable fee will be awarded. Consequently, the analysis in a common fund case focuses not on the plaintiffs' position as "prevailing parties," but on a showing that the fund conferring a benefit on the class resulted from their efforts. In this context, monetary results achieved predominate over all other criteria.

*Camden I,* 946 F.2d at 774 (citing H. Newberg, Attorney Fee Awards §§ 2.06–07 (1986)).

Because this is a common fund case, the percentage of benefit method should be applied. Also, applying a lodestar method in this case would not create a particularly accurate or scientific result, given the extreme difficulty of determining the number of attorney hours that advanced the settlement of the class action, as opposed to time spent pursuing claims of individual clients. The attorneys have not even attempted to divide their time in this manner, and the Court would simply have to guess at a reasonable number of hours to apply a lodestar method. Furthermore, the PLRA indicates that attorney fees awarded in prison cases should be proportional to the benefit obtained. 42 U.S.C. § 1997e(d)(1)(B)(i).

Generally, the percentage of a common fund allocated to attorney fees is between 20 to 30 percent, but this percentage may be higher or lower depending upon the particular circumstances of individual cases. *Camden I,* 946 F.2d at 774 (*citing* Newberg, at § 2.08). The following factors should be considered: (1) The time and labor required; (2) The novelty and difficulty of the questions; (3) The skill requisite to perform the legal service properly; (4) The preclusion of other employment by the attorney due to acceptance of the case; (5) The customary fee for similar work in the community; (6) Whether the fee is fixed or contingent; (7) Time limitations imposed by the client or the circumstances; (8) The amount involved and the results obtained; (9) The experience, reputation, and ability of the attorneys; (10) The "undesirability" of the case; (11) The nature and length of the professional relationship with the client; and (12) Awards in similar cases. *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir. 1974); *Brown v. Phillips Petroleum Co.,* 838 F.2d 451, 454 (10th Cir.), *cert. denied,* 488 U.S. 822, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988) (noting that the *Johnson* factors are relevant to the percentage that should be awarded). In addition, courts should consider "the time required to reach settlement, whether there are substantial objections by class members or other parties to settlement terms or the fees requested, any nonmonetary benefits conferred upon the class by the settlement, and the economics involved in prosecuting class action." *Camden I,* 946 F.2d at 775.

Virtually all of these factors counsel a fee award higher than the customary 20 to 30 percent range in this class action. Class counsel expended considerable time and labor on this case, which presented novel and difficult legal questions during discovery. The arduous discovery process precluded most other employment by class counsel. The fee was contingent rather than fixed. The attorneys were some of the best in Missouri, and they represented prisoners, one of the least popular groups of clients. In addition, settlement negotiations consumed a significant amount of time, and the class received important nonmonetary benefits. Indeed, but for the skillful work of these dedicated lawyers, it is likely that only a handful of inmates would have obtained any monetary relief.

The objectors' arguments, however, persuade the Court that class counsel should receive less than the $900,000 percent requested. Although class counsel spent many hours litigating this case, just compensation in a common fund case is determined more by the benefits obtained for the class than the number of hours expended. The Court is also concerned that the fees requested exceeds the amount included in some contingent fee agreements. Finally, it is uncertain whether the funds allocated to compensate the class members will be sufficient. As explained earlier, members of Groups A and B would be unlikely to receive any compensation for their treatment in Texas in the absence of this settlement. However, Group C may run a risk of under compensation. The Settlement Agreement allocates $820,000 to Group C. Class counsel identified 59 potential members of Group C from among the 700 Plaintiffs who have already filed suit. After the videotapes were discovered, it was well known that lawyers were accepting clients who had been imprisoned in Texas. It, therefore, stands to reason that most of the prisoners who suffered significant physical injuries would have contacted one or more of these attorneys. However, as class counsel acknowledged at the fairness hearing, no one knows exactly how many of the 1400 unrepresented class members may also belong in Group C. Furthermore, although the majority of the known members of Group C seem to have suffered only mild or moderate injuries, some may have suffered severe injury. To ensure that these class members are sufficiently compensated, and for the other reasons mentioned, the Court will approve the Settlement Agreement, but will award $800,-000 in attorney fees to class counsel plus the $300,000 in expenses and administration costs. Under the terms of the Settlement Agreement, an additional $100,000 would then be allocated to Group C. Any excess funds in Group C would then be shared with Groups A and B. The class, as a whole, would thereby receive more than half of the settlement fund, or $1,120,000.

The funds used to compensate class members should be free from any further claims by attorneys. *See Walitalo v. Iacocca*, 968 F.2d 741, 749 (8th Cir.1992) (attorneys' fee award in class action should evaluate whether Plaintiffs' fee arrangements with individual counsel should be modified). The cases in which attorneys represented individual Plaintiffs, rather than the class, will be barred by the class action settlement. Those individual cases did not result in any recovery for the individual Plaintiffs, and those attorneys should not be entitled to a share of the funds awarded to the class members under the settlement of this case.

### 3. Whether Class Members Should be Allowed to Opt Out of the Settlement and the Appropriateness of Class Certification

On July 29, 1999, this Court conditionally certified a mandatory, no opt-out class pursuant to Federal Rule of Civil Procedure 23(b)(2). The certification was made conditional so that the Court could decertify the class if the settlement was not appropriate or the rights of class members had not been adequately protected. Several objectors have expressed a preference to have their individual cases tried, effectively arguing that this matter should not have been certified as a class action or that they should have the right to opt out of the class action. Having read the objections filed by some class members and having listened to the testimony of the objectors at the fairness hearing, the Court remains convinced that a mandatory, no opt out class action is proper under the Federal Rules of Civil Procedure and the United States Constitution and is the most fair and effective means of resolving the dispute.

A mandatory class under subsection (b)(2) is appropriate "if classwide injunctive relief is sought when the defendant 'has acted or refused to act on grounds generally applicable to the class.'" *DeBoer*, 64 F.3d at 1175 (*quoting* Fed.R.Civ.P. 23(b)(2)). To meet the requirements of subsection (b)(2), "[the] putative class [must] demonstrate that the interests of the class members are so like those of the individual representatives that injustice will not result from their being bound by such judgment in subsequent application of the principles of *res judicata*." *Hassine v. Jeffes*, 846 F.2d 169, 179 (3rd

Cir.1988). A class may be certified under subsection (b)(2) even when damages are sought incidentally to the prayer for equitable relief, *DeBoer*, 64 F.3d at 1175. However, certification under (b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." Fed.R.Civ.P. 23(b)(2) advisory committee's note to 1986 amendment. On the other hand, a substantial damage award should not preclude certification of a(b)(2) class seeking predominantly equitable relief. *See Thomas v. Albright*, 139 F.3d 227, 235 (D.C.Cir.), *cert. denied*, 525 U.S. 1016, 119 S.Ct. 539, 142 L.Ed.2d 448 (1998); *Stewart v. Rubin*, 948 F.Supp. 1077, 1090 (D.D.C.1996), *aff'd*, 124 F.3d 1309, 1997 WL 369455 (1997) (approving (b)(2) class although compensatory damages exceeded $4 million).

In this case, the injunctive relief sought by the class clearly predominates over individual requests for monetary damages. As many objectors told the Court at the fairness hearing, their primary concern is not money. Rather, the objectors want to ensure that they are never again sent to Texas under the conditions that existed in the Texas Cell Lease Program, and they want to protect future inmates from similar experiences.[10] The injunctive relief provided in the settlement addresses these concerns by limiting when and under what conditions Missouri prisoners can be transferred out of state and by providing a means of redressing conduct violations unfairly imposed while the class members were in Texas. These liberty concerns substantially outweigh questions of money. Furthermore, while the monetary relief provided in the settlement is significant, the State of Missouri will be enjoined by the terms of the settlement from confiscating all of that monetary relief as reimbursement for costs of incarceration pursuant to the Missouri Reimbursement Incarceration Act, R.S.Mo. §§ 217.825, *et seq.* This injunctive relief effectively offsets the monetary relief which is contemplated by the settlement. Finally, one of the primary reasons that Rule 23(b)(2) certification was adopted in 1966 was to provide a vehicle to efficiently resolve mass civil rights violations and has been specifically approved for use where prison inmates were seeking injunctive relief against violent guards. *See* 7A WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE, Civil 2d, § 1775 (1986). Class certification in this case is consistent with both the text and intent of Rule 23(b)(2).

The Court is aware that the U.S. Supreme Court has recently expressed concern about the use of class actions to resolve mass tort claims. The Supreme Court's two overarching concerns have been whether the class is adequately represented and whether the class is sufficiently cohesive to warrant adjudication by representation.[11] In this case, all the class members are readily identified. Their claims are temporally and geographically circumscribed. Unlike some of the recent mass tort class actions which have been rejected by the U.S. Supreme Court, this class action does not involve unpredictable damages that may arise in the future, or involve claimants that are yet unborn. Moreover, most of the legal theories asserted in the class complaint apply comprehensively to the class. For example, the resolution of the breach of contract/third party beneficiary claim would affect all members of the class. Whether or not DOC officials were deliberately indifferent to the needs of the Missouri prisoners in Texas would have more to do with the treatment of the class as a whole than the treatment of individual class members. As to the civil rights claims raised by the class, it would be issues of liability and common damages that would predominate if this class action were litigated rather than settled. Furthermore, the risks associated with individual litigation are more easily predicted when the class consists of a group of plaintiffs that are perceived by society in stereotypical ways.

The class has also been skillfully and fairly represented by class counsel. The Settle-

---

10. At the fairness hearing, even Daniel Owsley, one of the more seriously injured objectors, indicated a greater concern about the State of Missouri's policies than about his own injuries.

11. The Supreme Court has also made it clear that compliance with Rule 23 is required. As previously discussed, that requirement has been met in this case.

ment Agreement is not a Ptomkin village, designed for the purpose of deception. It is not like those class actions where the named plaintiffs receive a more favorable settlement than class members who were not parties to the original suit. Prior to the filing of the class complaint, class counsel individually represented prisoners from Groups A, B & C and it is clear that the interests of each group have been carefully protected in the settlement. In fact, the prisoners in Group C, who by definition have the greatest injury, and hence, are at the greatest risk of under-compensation, were probably all represented by individual counsel prior to the settlement. Not only is the settlement a fair resolution of the dispute, but the interests of all members of the class were vigorously defended during the litigation and settlement process. Each class member received notice of the settlement and had an effective way to bring their objections to the Court. The interests of the objectors were also expertly represented by appointed counsel at the fairness hearing.

In short, this is precisely the kind of litigation appropriate for class action settlement. The class is not so large as to sweep in unknown, unknowable and largely unpredictable claims, but sufficiently large to pose an untenable burden for the class, the defendants, the Court and thereby indirectly the community. This is also a class that may not have the resources to pursue their claims individually, but as a group can effectively redress their grievances. Finally, the due process rights of the class have been vigilantly protected.

### IV. Conclusion

Having considered the Grunin factors, as well as the objections to the settlement, the Court concludes that the settlement is fair, reasonable, and adequate. The Court awards $300,000 in costs and administration fees to be deducted from the settlement fund and approves $800,000 in attorney fees to be paid to class counsel from the settlement fund. It is further

ORDERED that within 30 days, the parties shall submit to the Court a joint proposal describing how claims by class members will be processed, including a draft claim form, a suggested timeline for when claims should be submitted, and a short description of the procedure for allocating the funds from the settlement.

This Order will result in a final judgment being entered in the Texas prison litigation class action.